**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CALVIN E. BENFORD, | ) |
|         Plaintiff, | ) <br> ) <br> )   No. 07 CV 6958 |
|         v. | ) <br> )   HONORABLE DAVID H. COAR |
| CHICAGO BEVERAGE SYSTEMS L.L.C., | ) <br> ) |
|         Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Calvin Benford brings an action against Defendant Chicago Beverage Systems L.L.C. ("CBS" or "Defendant") alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") (Count I), 29 U.S.C. § 621 *et seq.*, retaliatory discharge in violation of the Illinois Workers' Compensation Act (Count II), 820 ILCS § 305/1 *et seq.*, and retaliatory discharge for reporting a supervisor's improper conduct (Counts III and IV). Before the Court now is Defendant's Motion for Summary Judgment. For the reasons stated below, the motion is granted in part and denied in part.

**I.    FACTS**

The facts below are generally taken from Defendant's Statement of Undisputed Material Facts ("DSOF") and Plaintiff's Statement of Additional Facts ("PSOF"); the Court will note where there are disputes about material facts.[1]

    **a.  Background**

---

[1] Plaintiff has also moved to strike Defendant's Reply to Plaintiff's Response to Defendant's Statement of Undisputed Material Facts because it contains replies to Plaintiff's responses to Defendant's statements of material facts. These replies are not prohibited by Local Rule 56.1; in any event, those replies were largely ignored by this Court, which relied instead on the factual record itself rather than the parties' interpretations of it. Plaintiff's motion to strike is denied.

1

Defendant CBS is a beer distribution company operating in the Chicago area. DSOF ¶ 3. CBS hired Plaintiff as a regular, full-time employee in 1997, although he had previously worked at the company as a temporary employee. *Id.* Plaintiff held a number of positions at CBS, but in his last position, he was responsible for driving a forklift in the warehouse and loading heavy pallets of beer onto trucks for delivery. *Id.* at ¶ 4. Plaintiff worked under Sid Murff, his immediate supervisor, Jim Burns, another supervisor, Mike Nino, director of operations, and Bill Emerson, Vice President of Supply Chain Management. PSOF ¶ 1. Plaintiff was born on February 5, 1959. DSOF ¶ 3.

### b. Plaintiff's Shift on October 7, 2005

On Thursday, October 7, 2005, Plaintiff worked an overnight shift from 8 p.m. until approximately 4 or 5 a.m. on Friday, October 8. DSOF ¶ 13. Sometime before midnight during that shift, Plaintiff's supervisor Murff spoke to Plaintiff regarding pallets of beer that Plaintiff had ostensibly loaded onto the wrong trucks. DSOF ¶ 15.

The facts are not clear regarding whether Plaintiff actually made mistakes during the October 7-8 shift. In his deposition, Plaintiff testified that he had made "a couple" of mistakes during that shift, but clarified that he meant that "the supervisor [Murff] didn't tag the trucks." Benford Dep. 110:6-10, Jan. 15, 2009. When Murff confronted Plaintiff about his so-called mistakes during the shift, Plaintiff argued that Murff had failed to "tag" the trucks. *Id.* at 115:7-21; *see also id.* at 125:2-6 ("Q: Do you recall telling Mr. Burns during that Thursday to Friday shift that you knew you were making mistakes? A: Mistakes? The mistake was made because the—because the trucks weren't tagged properly.") Plaintiff testified that either five or six times in his employment or twice per month in 2005, Murff gave him loading instructions that were contrary to his written instructions. DSOF ¶ 41. Murff was later terminated in 2007 for theft

2

after having been reported to CBS by a warehouse employee. DSOF ¶ 42. Plaintiff suggests, but Defendant disputes, that Murff's gave incorrect loading instructions to Plaintiff on October 7 in order to steal products from Defendant. PSOF ¶ 22.

Regardless, after Murff spoke to Plaintiff, Burns approached Plaintiff and told him that he was concerned about Plaintiff's safety and that Plaintiff would be subject to a reasonable suspicion alcohol and drug test if he continued to make errors. Benford Dep. 150:3-6, 127:9-16. Burns and Murff then spoke with Burns' supervisor Emerson and informed him that Plaintiff had made uncharacteristic mistakes, and that Plaintiff had been told that continued mistakes would subject him to an alcohol and drug test. *Id.* at ¶ 17. Burns and Murff also spoke with Nino. Nino, Burns, and Emerson agreed to subject Plaintiff to the test. *Id.* ¶ 18.

Plaintiff took the drug test. On the following Monday, October 10, 2005, the drug testing clinic informed Defendant that Plaintiff had tested positive for cocaine. *Id.* at ¶ 19, 20. Plaintiff objects to the trustworthiness of the drug test, but does not deny that the result of Plaintiff's test was a positive indication for cocaine. Emerson, Nino, and Vice President of Human Resources Charlotte Rangel met to discuss Plaintiff's positive cocaine test, and then Emerson (or possibly Emerson and Nino together) decided to terminate Plaintiff's employment with CBS. Rangel Dep. 62:1-20, Jan. 23, 2009; Nino Dep. 51:15-23, Jan. 23, 2009; Emerson Dep. 75:15-22. Plaintiff was terminated on October 11, 2005. Plaintiff admits that no CBS manager ever made any comments about his age. DSOF ¶ 43.

### c. CBS's Drug and Alcohol Policies

Plaintiff and other hourly CBS employees were members of the Teamsters Local 744 union ("Union"). CBS and the Union were signatories to a Collective Bargaining Agreement ("CBA") in effect from February 1, 2003 through January 31, 2008. The CBA governs the terms

3

and conditions of employment for hourly employees and contains a grievance process leading to final and binding arbitration.  DSOF ¶ 5.  The CBA provides that union employees such as Plaintiff may be discharged for cause and need not be given advance notice of discharge due to intoxication (being under the influence of drugs, narcotics or other controlled substances) or the consumption of controlled substances during work hours.  DSOF ¶ 6.

CBS and the Union have also entered into a Drug and Alcohol-Free Work Place Policy ("Policy"), a Memorandum of Understanding which is a part of the CBA and has been in effect since 1998. The Policy prohibits employees from working or reporting to work under the influence of drugs or alcohol or with a prohibited amount of drugs (including cocaine) or alcohol in their systems, and provides that such behavior constitutes just cause for immediate discharge. DSOF ¶ 7.  Plaintiff testified that he was aware that Defendant and the Union had entered into a policy requiring employees to be alcohol and drug-free, and that he understood the policy had been implemented at least in part for the safety of CBS employees.  DSOF ¶ 10.

The Policy provides for both random and reasonable suspicion testing.  PSOF Ex. H at D00312.  Under the former, "all employees may be required to undergo random and/or periodic urine tests for illegal drugs" when selected for random testing.  *Id.*  Under the latter, "in the event the Employer reasonable [sic] suspects that an employee is using or under the influence of illegal drugs while at work, an investigation will be conducted.  As part of this investigation, the employee may be required to submit to a urine test for drugs."  *Id.* at D00313.  There are no policies or procedures for determining whether an employee is reasonably suspected of using or being under the influence of drugs; instead, some supervisors (but not all) have been trained to recognize suspicious behavior.  PSOF ¶ 13; Mason Dep. 68:16-24, 196:3-16, Jan. 21, 2009.

4

Under the Policy, any employees who tests positive (under either a random or reasonable suspicion test) shall be subject to immediate discharge and that such discharge will be deemed to be for just cause. *Id.* at D00314. However, the Policy allows CBS to give any employee with more than one year of service the option, in lieu of immediate discharge, of signing a "Last Chance Agreement" and going on an unpaid leave of absence. *Id.* The Policy does not distinguish between the consequences for testing positive in a random test versus in a reasonable suspicion test. Emerson testified that "the labor agreement at times can be a bit ambiguous, so in some instances there is that portion of it that we will investigate to see if there is a past practice that applies." Emerson Dep. 50:2-7. Emerson and Michael Mason (whose affiliation with CBS is not clear from either Defendant or Plaintiff's filings) testified that Defendant's unwritten past practice was to give employees who tested positive in a random drug test the opportunity to enter into a Last Chance Agreement if that employee had worked for Defendant for more than a year, but to immediately terminate an employee who tests positive under a reasonable suspicion test. *Id.* at 57:9-24; Mason Dep. 99:9-100:1, 146:19-147:3.

Defendant has required at least two other employees besides Plaintiff to undergo reasonable suspicion testing: Mark Lalik (date of birth 9/16/75) and Ted Wierzchowski (date of birth 2/17/63) in 2003. Lalik was a truck driver who was observed driving erratically and who ultimately tested positive for alcohol in a breath test and admitted drinking a beer while on duty. Wierzchowski worked in the warehouse and was asked to undergo reasonable suspicion testing after he was observed with glassy and watery eyes, engaged in insubordination, and dropped a pallet of barrels. Wierzchowski tested positive for alcohol. DSOF ¶ 44. Both Lalik and Wierzchowski were terminated without being offered a Last Chance Agreement. DSOF ¶ 45.

### d. Other Notable Incidents During Plaintiff's Employment

In 1997, Plaintiff injured his back at work and filed two workers' compensation claims related to the injury that year. He was off work for several weeks and received benefits as a result of his claims. DSOF ¶ 23; Benford Dep. 65:16-18. No one in CBS management ever talked to Plaintiff about his injury or workers' compensation case, and Plaintiff's job duties were not altered as a result of the injury. DSOF ¶ 33. Emerson was not aware prior to this lawsuit that Plaintiff's had ever filed a workers' compensation claim. DSOF ¶ 34.

In or around the year 2000, Plaintiff arrived slightly late to work and got into an altercation with Murff. Plaintiff testified that Murff then grabbed him around the neck and choked him. Benford Dep. 202:6-205:10. Murff choked Plaintiff for "a couple minutes" and stopped after Plaintiff demanded that he stop. *Id.*; DSOF ¶ 36. Plaintiff testified that both he and Murff then talked to Nino individually over the phone. DSOF ¶ 37. The next day, Plaintiff met with Nino and explained the incident. Other than this, no one in the company ever talked to Plaintiff about the incident further. Plaintiff did not report Murff to the police or anyone else in management, nor did he tell the Union or file a grievance over it. DSOF ¶ 39. Emerson and Rangel were never aware of any conflict between Murff and Plaintiff prior to this lawsuit. DSOF ¶ 40.

## II.     STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing that

6

no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must set forth specific facts (a "scintilla of evidence" is insufficient) demonstrating that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 252; *see also Celotex*, 477 U.S. at 324. When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). This standard of review is applied to employment discrimination cases with "added rigor." *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993).

### III. ANALYSIS

#### a. ADEA Claim

In Count I of the Complaint, Plaintiff alleges that was not afforded the same benefits, privileges, terms and conditions of employment, and was generally treated differently than similarly-situated younger employees. Compl. 4. When Plaintiff was fired, he was 46 years old.

To survive a summary judgment motion on an ADEA claim, an employee alleging employment discrimination must show incidents of illegal discrimination through either direct proof or, more commonly, indirect proof. *Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003). The typical direct method situation is an admission of discriminatory animus by the employer, but a plaintiff can also prevail under the direct method of proof by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker. *Phelan v. Cook County*, 463 F.3d 773, 779 (7th Cir. 2006). Here Plaintiff does not claim to have any direct evidence of discrimination, and instead elects to proceed under the indirect method of proof.

7

The indirect method of proof for ADEA claims is the same *McDonnell Douglas* burden-shifting approach used for Title VII discrimination cases, where the plaintiff bears the initial burden of establishing a *prima facie* case of intentional discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-06 (1973); *Hall v. Bodine Elec. Co.*, 276 F.3d 345, (7th Cir. 2002); *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000); *Peele v. Country Mutual Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002); *Szymanski v. County of Cook*, 2002 WL 171977 at *5 (N.D.Ill.). Once the plaintiff establishes a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Peele*, 288 F.3d at 326. If the employer satisfies that burden, the presumption of discrimination is rebutted, and the burden shifts back to the plaintiff to persuade the trier of fact either directly that a discriminatory reason more likely motivated the action or indirectly that the employer's articulated reason for the employment action is unworthy of credence and is but a mere pretext for intentional discrimination. *Id.*

In order to establish the *prima facie* case of employment discrimination under the *McDonnell Douglas* schema, a plaintiff must provide evidence that (1) he is a member of a protected class, (2) his work performance met the employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly-situated employees outside of the protected class were treated more favorably by the employer. *Id.* If a plaintiff proceeding under the indirect method fails to establish any one of the four factors of the *prima facie* case, the court generally need not proceed any further and summary judgment will be entered for the defendant. *Id.* at 331; *see also Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680-681 (7th Cir. 2002).

Defendant contends that Plaintiff cannot meet his burden under the *McDonnell Douglas* burden-shifting scheme. Defendant concedes that Plaintiff was a member of a protected class and that he suffered an adverse employment action, but argues that Plaintiff failed to meet his employer's legitimate expectations and also cannot show that similarly situated employees outside of the protected class were treated more favorably by Defendant.

### 1. Legitimate Expectations

Defendant argues that Plaintiff cannot meet the second element of his *prima facie* case because he was not performing up to Defendant's legitimate expectations. Plaintiff argues that he was performing his job duties adequately (but also admits that he failed the drug test administered to him on the morning October 8, 2005 by testing positive for cocaine).

Plaintiff first argues, confusingly, that CBS's drug policy was unclear because it did not distinguish between the consequences of a random and reasonable suspicion test and employees did not have notice that they could be terminated immediately for failing a reasonable suspicion test. This argument is a non-starter. The Policy is quite clear: employees are prohibited from working with a prohibited amount of drugs or alcohol in their systems, and such behavior constitutes just cause for immediate discharge. DSOF ¶ 7. Under the Policy, Defendant has discretion to determine whether an employee who fails a drug test should be fired immediately or given an opportunity since a Last Chance Agreement. Defendant's management employees testified consistently that Defendant's past practice was to terminate immediately those employees failing reasonable suspicion drug tests but to offer Last Chance Agreements to those failing random tests. Simply because Defendant exercised its discretion in assigning different consequences to different types of drug tests does not mean that Defendant did not have a legitimate expectation that its employees be drug-free.

9

Plaintiff also argues, more convincingly, that he was unfairly singled out because he was the only one of the workers during that shift who was asked to take a drug test. Defendant's position is that simply by dint of the fact that Plaintiff tested positive for cocaine while on the job, he failed to meet Defendant's legitimate expectations. An employer's expectation that its employees not be on drugs while at work is legitimate; generally, plaintiffs arguing a *prima facie* case of employment discrimination must establish that they have met their employers' legitimate expectations. However, the Seventh Circuit has carved a narrow exception excusing plaintiffs from showing that they met their employer's expectations "when a plaintiff alleges that other employees were also not meeting the employer's expectations but the employer selectively punished the plaintiff, or punished the plaintiff more severely, for discriminatory reasons." *McNair v. Bonaventura*, 46 Fed. Appx. 849, 852 (7th Cir. 2002); *see also Curry v. Menard, Inc.*, 270 F.3d 473, 478 (7th Cir. 2001) (where plaintiff that she violated defendant's policy but also claims that she was disciplined more harshly than non-black employees who also violated the policy, she does not need to show she was meeting employer's legitimate expectations to establish a prima facie case of discrimination).

Plaintiff was subjected to a reasonable suspicion drug test. What constitutes suspicious behavior is not defined in the Policy. Some but not all supervisors are trained to recognize suspicious behavior, and the record is unclear as to whether Murff had been so trained. Plaintiff's "suspicious behavior" during his October 7 shift was apparently the fact that he had incorrectly loaded product onto the wrong trucks. However, according to Plaintiff, during the same shift, forklift operators Rick Johnson, Rick Weber, and Sammy Akel were loading the same trucks as Plaintiff and also made loading errors. DSOF ¶ 46. None of these employees were required to submit to a drug test. PSOF ¶ 16. Johnson and Weber are both older than

10

Plaintiff; Akel is twenty years younger. DSOF ¶ 46. If the other warehouse workers were behaving as Plaintiff did, then Plaintiff's punishment (being required to submit to a reasonable suspicion drug test, and the resulting termination) was harsher than his co-workers'. The discrepancy in their punishment creates a genuine issue of material fact as to whether Plaintiff's behavior was singled out as reasonably suspicious.

### 2. Similarly Situated Employees

Defendant argues that there is no evidence that similarly-situated employees outside of the protected class were treated more favorably by the employer. The similarly situated requirement in *McDonnell Douglas* entails a showing that the Plaintiff and the comparator employee dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 404-05 (7th Cir. 2007) (internal citations omitted). In disciplinary cases in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason, a plaintiff must show that he is similarly situated to the comparator with respect to performance, qualifications, and conduct. *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617 (7th Cir. 2000).

At the same time, this requirement is a flexible one that considers "all relevant factors, the number of which depends on the context of the case," and is not "an unyielding, inflexible requirement that requires near one-to-one mapping between employees—distinctions can always be found in particular job duties or performance histories or the nature of the alleged transgressions." *Humphries*, 474 F.3d at 405. There is no requirement that a plaintiff show complete identity to a "similarly situated" employee; rather, the inquiry simply asks whether

11

there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination or retaliation. *Id.*; *see also South v. Illinois Environmental Protection Agency*, 495 F.3d 747, 752 (7th Cir. 2007). "A single comparator will do; numerosity is not required." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 406-407 (7th Cir. 2007).

Even using this flexible, common sense approach, this Court is unable to find that Plaintiff has offered any suitable comparators to meet his *McDonnell Douglas* requirement. Plaintiff's age discrimination case rests on the theory that he was punished more severely (i.e., required to submit to a reasonable suspicion drug test leading to his positive results and termination) than similarly situated younger employees; the appropriate comparator would therefore be a younger warehouse employee whose conduct matched that of Plaintiff but who was not required to submit to a reasonable suspicion drug test.[2] The only possible comparator offered by Plaintiff fitting this description would be Sammy Akel, but Plaintiff does not offer sufficient facts about Akel to meet the fourth prong of his prima facie case. This Court has been presented with only the following facts about Akel: 1) he was born on January 19, 1979; 2) he was a forklift operator working during the October 7 night shift; and 3) Plaintiff testified that Akel loaded the same trucks as Plaintiff that evening and also made loading errors. DSOF ¶ 46. Plaintiff has failed to present the Court any other information about Akel's job responsibilities, qualifications, or prior performance. It is unclear whether Akel is supervised by the same

---

[2] Plaintiff also offers other comparators who are even less suitable for comparison. He offers three CBS employees (Gregory Bea, Marcus Horton, and Thomas Fairchild) who had also tested positive for cocaine but who were offered Last Chance Agreements instead of being terminated immediately. However, unlike Plaintiff, these employees were subjected to random, not reasonable suspicion testing. Their discipline was consistent with Defendant's policies. Def.'s Reply Mem. 7-8.

supervisors as Plaintiff. It is also unclear whether Akel's loading errors were as serious or as uncharacteristic as Plaintiff's; it is only Plaintiff's testimony, uncorroborated by any other sources, that Akel made the same mistakes as Plaintiff. Without more information about Akel, this Court cannot find that there are sufficient commonalities that would allow a jury to reach an inference of discrimination.

### 3. Pretext

Even if Plaintiff had presented a suitable comparator and had demonstrated a prima facie case, his ADEA claim would still fail because he cannot present a genuine issue as to whether Defendant's stated non-discriminatory reason for terminating Plaintiff was a pretext for age discrimination. The ADEA only prohibits discrimination based on an illegal animus toward older employees. "The precise question then is not whether the employer's justification for the adverse action is a pretext, but whether it is "a pretext for the sort of discrimination prohibited by [Title VII]." *Greene v. Potter*, 557 F.3d 765, 769 (7th Cir. 2009) (quoting *McDonnell Douglas Corp.,* 411 U.S. at 804, 93 S.Ct. 1817); *see also Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("[I]t is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (emphasis in original)).

Defendant's stated non-discriminatory reason for terminating Plaintiff was his having failed a reasonable suspicion drug test. Plaintiff admits to having failed the drug test; Defendant's termination policy for employees who fail reasonable suspicion drug tests is clear. To show pretext, Plaintiff would have to create "at least an inference" that Defendant's stated reason was dishonest, and furthermore that Plaintiff was singled out for punishment because of

13

his age and not because of another reason, e.g. Murff's personal dislike of Plaintiff, which is unpleasant but not illegal under the ADEA. *Greene*, 557 F.3d at 769. Simply put, there is no evidence to suggest that this was the case. Plaintiff testified that of the three forklift operators on the October 7 shift who ostensibly loaded the same trucks and made the same errors as he did, two were older than he. All of the decisionmakers involved in Plaintiff's termination were older. DSOF ¶ 12, 17, 18, 21. Plaintiff has demonstrated no facts that would lead the Court to believe that Defendant was motivated by age-related animus against him. As such, his ADEA claim must fail. Summary judgment is granted for Defendant on Count I.

### b. Retaliation

Defendant also moves for summary judgment on Plaintiff's Illinois retaliatory discharge claims. Plaintiff claims that Defendant fired him in retaliation for his workers' compensation claim, for reporting to his superiors that Murff had choked him, and/or for reporting that Murff had directed him to load trucks with inventory that he was not instructed to load pursuant to his written instructions.

Illinois does not permit employers to fire an employee in retaliation for some action when such a termination would contravene public policy. "All that is required is that the employer discharge the employee in retaliation for the employee's activities, and that the discharge be in contravention of a clearly mandated public policy." *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 134 (1981); *Carter v. Tennant Co.*, 383 F.3d 673, 677 (7th Cir. 2004). "In the workers' compensation context, a plaintiff must show (1) that he was the defendant's employee before his injury; (2) that he exercised a right granted by the Workers' Compensation Act; (3) and that he was discharged from his employment with a causal connection to his filing a workers' compensation claim." *Carter*, 383 F.3d at 677. Plaintiff offers almost no argument

against Defendant's contention that Plaintiff's workers' compensation claim (in 1997, eight years before his termination) and his physical altercation with Murff (in 2000, five years before his termination) are too remote in time to be causally connected to Plaintiff's termination in 2005. Accordingly, summary judgment is granted in favor of Defendant on Counts I and II.

Count IV presents a thornier question. Count IV alleges that Plaintiff was terminated in retaliation for reporting Murff's contradictory instructions. First, Defendant argues that providing "contrary work instructions" not a contravention of public policy in Illinois. Although Illinois law does not define what constitutes "clearly mandated public policy," the Illinois courts have recognized that the state Constitution and statutes express the state's public policy concerns. *Palmateer*, 85 Ill.2d at 130. As the Supreme Court of Illinois has stated,

> Although no specific constitutional or statutory provision requires a citizen to take an active part in the ferreting out and prosecution of crime, public policy nevertheless favors citizen crime-fighters. Public policy favors the exposure of crime, and the cooperation of citizens possessing knowledge thereof is essential to effective implementation of that policy. [Citizen employees] acting in good faith who have probable cause to believe crimes have been committed should not be deterred from reporting them by the fear of . . . [employment] discharge.

*Id.*, 85 Ill.2d at 132. As such, an employer who fires an employee for refusing to engage in or for reporting suspected unlawful activity would be in contravention of a clearly mandated Illinois public policy concern. Being ordered to load inventory onto different trucks than outlined in written instructions is not simply the "contrary work instruction" Defendant claims it to be, since the action suggests embezzlement, a suggestion circumstantially evidenced by Murff's 2007 termination for stealing product from Defendant.

Second, Defendant argues that because Plaintiff did not report Murff's contrary work instructions to others in CBS, including those who ultimately decided to fire him, he cannot show causation. Viewed in the light most favorable to Plaintiff, the facts show that during the

15

October 7 work shift, Murff faulted Plaintiff for loading inventory onto the wrong trucks when it was actually Murff himself who had tagged the trucks incorrectly. Plaintiff told Murff that Murff had made mistakes, and then Murff argued to Burns that *Plaintiff* had made the mistakes, which set off a chain of causation resulting in Plaintiff being tested for drugs and then being terminated. In such circumstances, the Seventh Circuit has taken a more flexible approach to determining causation:

> If a manager with a retaliatory motive is involved in the employment decision, that retaliatory motive, in some circumstances, may be imputed to the company, even if the manager with a retaliatory motive was not the ultimate decisionmaker . . . Specifically, we have stated that the retaliatory motive of a "nondecisionmaker" may be imputed to the company where the "nondecisionmaker" influenced the employment decision by concealing relevant information from, or feeding false information to, the ultimate decisionmaker . . . In such a case, the [retaliatory] motive of the other employee, not the autonomous judgment of the nondiscriminating decision-maker, is the real cause of the adverse employment action.

*David v. Caterpillar, Inc.*, 324 F.3d 851, 861 (7th Cir. 2003). It is possible under these facts that Plaintiff's knowledge of Murff incorrectly tagging the trucks would lead Murff to fear that his mistakes and/or embezzlement would be discovered, and, as a result, would cause him to lie to Burns about Plaintiff's mistakes. A reasonable jury could return a verdict in favor of Plaintiff with the facts viewed in this light, and therefore summary judgment on Count IV is denied.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED as to Counts I, II, and III, and DENIED as to Count IV. Plaintiff's Motion to Strike is DENIED.

Enter:
/s/ David H. Coar
David H. Coar
United States District Judge

Dated: June 15, 2009